UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** § | |
| Plaintiff, § | |
| § | |
| vs. § | CR. NO. C-06-277 |
| § | |
| **ROBERT R. BENDER,** § | |
| Defendant. § | |

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO SUPPRESS

Defendant Robert R. Bender is charged by criminal information with the crime of simple possession of marihuana in violation of 21 U.S.C. § 844 (D.E. 1). Pending is defendant's motion to suppress evidence (D.E. 13). An evidentiary hearing was held June 5, 2006. Defendant Bender submitted a supplemental memorandum of authorities on June 12, 2006 (D.E. 16). After considering the evidence at the hearing and the briefs of the parties, the undersigned is of the opinion that the motion should be granted.

### Summary of Facts

On February 3, 2006, military police officers Bryan Beck and Avarn Hearn were on routine patrol at the Corpus Christi Naval Air Station (Tr. 5, 29)[1]. Officer Hearn was driving the patrol vehicle and Officer Beck was a passenger (Tr. 21). The officers were patrolling an area outside the North Gate. This area is part of the military installation but is open to the public (Tr. 16). The area

---

[1] "Tr." refers to the transcript of the June 5, 2006, hearing on the motion to suppress.

is not lit at night and considered to be a "high crime" area, particularly for gang and drug activity (Tr. 5, 31-32).

Along the roadway, about one and eight-tenths miles from the base gate are two reflective signs on the government property line informing travelers that they are entering federal property, every vehicle is subject to search, and entry on federal property amounts to consent to search (Tr. 6, 31, 38). The speed limit in the area is 50 miles per hour, and the signs can be read if a vehicle's headlights are on (Tr. 15, 38). Officer Hearn was unaware of whether the signs had been changed (Tr. 39), but according to Officer Beck, recently the signs were replaced with larger signs containing identical warnings (Tr. 15). Now the signs are three feet by five feet (Tr. 15). About the only thing readable on the smaller signs would have been the words "Government Property" (Tr. 16). Neither officer was aware of the exact date the larger signs were posted (Tr. 15-16, 39, 47-48).

The policy of the military officers is to check on the welfare of cars parked in that area (Tr. 18, 20-21, 42). The "check" includes an interview of all occupants to determine what they are doing, especially if a vehicle is parked where one is not usually parked (Tr. 21, 46). If anyone starts to leave, they will still be questioned (Tr. 18-19, 21). The area outside of the base gate is patrolled as part of the officers' responsibilities to maintain security at the base (Tr. 47)

At about 9:49 p.m., Officers Hearn and Beck began a routine patrol outside of the north gate area (Tr. 5). While exiting the gate, they observed a dark colored pickup truck facing the water without any lights on (Tr. 7). The truck was parked right outside the installation gate about 100 yards (Tr. 16, 41). Hearn and Beck had no idea how long the truck had been parked there (Tr. 19, 42). Officer Hearn, the driver, approached the vehicle, parked about fifteen to twenty feet behind it, and turned on his overhead and take down alley lights in order to identify himself and Beck as

law enforcement officers (Tr. 7-8, 30, 32, 43). As they pulled up, the vehicle's back-up lights lit up and the vehicle backed up about ten feet (Tr. 8, 33). Officer Hearn, who had stepped out of his vehicle and was walking toward the truck, told the driver to stop (Tr. 8, 33-34). The driver stopped, and when Officer Hearn was about five feet from the truck, he smelled an odor of marihuana which became stronger as he approached the vehicle (Tr. 34-35). The driver, later identified as defendant Bender, consented to a search of the vehicle the marihuana was discovered (Tr. 35-36). Before approaching the truck, Officer Hearn had no reason to suspect that the occupants inside it were in distress or involved in any kind of illegal activity (Tr. 42).

## Applicable Law

**A.     Military Installation**

The Code of Federal Regulations codifies the requirement that stops and inspections of personally owned vehicles on military installations are not authorized unless there is a reasonable suspicion of criminal activity or of a violation of a traffic regulation or of the installation commander's policy. 32 C.F.R. § 634.7(b). The government did not argue or present evidence of any violation of a traffic regulation or of the installation commander's policy.

**B.     Consent**

If it were clear that the larger of the signs were posted at the time defendant was stopped, consent would support the stop and questioning of defendant Bender. *See United States v. Ellis*, 547 F.2d 863, 865 (5th Cir. 1977) (consent valid where defendant accepted a visitor's pass on a military installation w/ a warning that acceptance of the pass grants consent to search). But Officer Beck was unsure whether the signs posted on February 3, 2006, were the larger readable signs or the smaller unreadable ones (Tr. 15-16). The government did not request an opportunity to present additional

evidence on this issue. Because Officer Beck testified that one could not read the smaller sign when traveling the roadway (Tr. 15), consent will not be relied upon as a justification for the questioning of the defendant.

**C.     Fourth Amendment**

The threshold issue is whether the Fourth Amendment was implicated during the defendant's encounter with the military officers. The Fourth Amendment protections are not triggered when a law enforcement officer approaches an individual on the street or in a public place and puts questions to him, asks for identification, and requests consent to search. *United States v. Drayton*, 536 U.S. 194, 200, 122 S.Ct. 2110, 2112-14 (2002); *Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323 (1983); *Florida v. Bostick*, 501 U.S. 429, 433, 111 S.Ct. 2382, 2386 (1991). A person is not "seized" within the meaning of the Fourth Amendment unless in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Florida v. Royer,* 460 U.S. at 501-01, 103 S.Ct. at 1326. The crucial test is whether, "taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Florida v. Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387 (citations omitted).

Both officers conceded that the defendant was not free to leave. In fact, when he tried to leave, Officer Hearn ordered him to stop. Although no cases were found in the Fifth Circuit, other circuits have grappled with the issue of whether the Fourth Amendment is implicated when an officer approaches a parked car. Of those cases which held that the protections of the Fourth Amendment were not triggered, the absence of any coercion on the part of law enforcement was key. *See U.S. v. Dockter*, 58 F.3d 1284, 1286-87 (8th Cir. 1995) (Fourth Amendment not implicated where

deputy pulled his vehicle behind defendant's vehicle and activated flashing lights because no weapons were displayed and because of the absence of any of physical touching, and absence of any language or tone of voice indicating that compliance with the officer's request might be compelled); *United States v. Barry* 394 F.3d 1070, 1075 (8th Cir. 2005) (questioning of individuals in a parked vehicle late at night in an alley behind a shopping center did not amount to a seizure implicating the Fourth Amendment); *U.S. v. Kim*, 25 F.3d 1426, 1430 (DEA agent partially blocked the egress of Kim's vehicle and approached him requesting leave to ask some questions; held DEA agent refrained from coercive tactics which might undermine the consensual nature of the encounter with Kim);

Unlike all of the cases cited above, in this case Bender was not free to leave. When he tried to ignore the officers and drive away, he was ordered to stop. The element of coercion is present in this case, and absent in the *Kim, Barry,* and *Dockter*, cases listed above. The Fourth Amendment was indeed triggered by this encounter, and Bender was "seized" for purposes of the Fourth Amendment.

**D.     Reasonable Suspicion**

For the seizure to have been lawful, it must have been based upon a reasonable suspicion that criminal activity was afoot. *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 2640 (1979); *Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868 (1968). In *Terry*, the Supreme Court held that an officer does not violate the Fourth Amendment when he conducts a brief investigatory stop if he has a reasonable, articulable suspicion that criminal activity has occurred or is occurring. 392 U.S. at 24-30, 88 S.Ct. at 1883-85. The reasonable suspicion standard does not amount to probable cause, but requires a "minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528

U.S. 119, 120 S.Ct. 673, 767 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581 (1989)).  A "hunch" of criminal activity will not suffice.  *Illinois v. Wardlow*, 120 S.Ct. at 676 (citing *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883).  Presence in a "high crime" area alone is insufficient to trigger reasonable suspicion.  *United States v. Beck*, 602 F.2d 726, 729 (1979).

The government argues that Bender engaged in unprovoked "flight" when he backed up to leave the area, and that his flight coupled with his presence in a "high crime" area make his circumstances identical to those described in *Wardlow*.  But in *Wardlow,* the defendant saw police and took off running.  528 U.S. at 122, 120 S.Ct. at 675.  The officers in *Wardlow* did not decide to question the defendant until he ran, and the Supreme Court found that the flight, coupled with the presence in a "high crime" area justified a *Terry* type intrusion.  528 U.S. 123-26, 120 S.Ct. 676.  Here the officers were intending to question Bender before he ever backed up his car.  Bender backed up his vehicle a few feet, which could hardly be described as the "headlong flight" which the Supreme Court found was central to the justification for the stop in *Wardlow*.  528 U.S. at 124-26, 120 S.Ct. at 676.

When an officer approaches an individual without reasonable suspicion or probable cause, admittedly the case here, the individual has a right to ignore the police and go about his business. *Florida v. Royer*, 460 U.S. at 498, 103 S.Ct. at 1324.  The "refusal to cooperate, without more, does not furnish the minimal level of justification needed for a detention or seizure."  *Florida v. Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387.  Applying that reasoning here, the government cannot use Bender's obvious desire not to speak with them to create the justification for  seizing him.

Accordingly, all evidence obtained as a result of the illegal seizure of Bender is suppressed. *Beck*, 602 F.2d at 729 (5th Cir. 1979) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-86, 83 S.Ct. 407, 415-16 (1963)).

ORDERED this 30th day of June, 2006.

_____
B. JANICE ELLINGTON
UNITED STATES MAGISTRATE JUDGE